First Division
September 25, 2006

No. 1-05-0106

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 02 CR 25985 |
| | ) | |
| FREDDY VASQUEZ, | ) | Honorable |
| | ) | Eddie Stephens, |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Following an October 2004 jury trial, defendant, Freddy Vasquez, was found guilty of aggravated unlawful use of a weapon by a felon and unlawful use of a weapon by a felon. The trial court sentenced defendant to a term of six-years' imprisonment, ordered defendant to pay $619 in fines, fees and costs, and ordered defendant to submit a DNA sample.

Defendant appeals, arguing that: (1) the State failed to prove defendant guilty beyond a reasonable doubt because the testimony of a police officer was so incredible that it defied logic; (2) defendant did not receive a fair trial because a police officer testified that defendant was a "gang banger"; (3) the trial court erred in failing to provide the jury with a definition for reasonable doubt when the jury requested the definition; (4) defendant was denied his sixth amendment right to effective assistance of trial counsel; (5) defendant is entitled to a reduction in the total amount of fines imposed because (a) the Violent Crime Victim Assistance Fund statute only permits its imposition when no other fines have been imposed and the $4 criminal/traffic conviction surcharge is a fine, and (b) defendant is entitled to a credit for the $4 criminal/traffic conviction surcharge because of his presentence credit; and (6) the statute authorizing the compulsory extraction and perpetual storage of the DNA of felons violated defendant's

fourth amendment rights.

Defendant was charged by indictment with aggravated unlawful use of a weapon by a felon and unlawful use of a weapon by a felon.

Defendant filed a motion to quash arrest and suppress evidence. In December 2003, the trial court conducted a hearing on defendant's motion.

Defendant testified at the suppression hearing that on August 30, 2002, at around 3 a.m. he was at the home of Willie Rosado, located at 2502 West Division. Defendant was spending the night at that location. On cross-examination, defendant denied going outside of the building during the early morning hours. Defendant said that the only time he went outside of the residence was when the police arrested him and escorted him out. Defendant stated that Rosado is defendant's brother. Rosado was in front of the house at the time of defendant's arrest.

Defendant was later recalled to the witness stand. Defendant stated that the entrance at 2502 West Division has a glass door at the bottom of the stairway. Once a person walks up the stairs, he walks into the apartment. The stairs do not lead anywhere other than the apartment.

Defendant called Officer William Hartz. Officer Hartz testified that at about 2:45 a.m. on August 30, 2002, he was in the area of 2502 West Division with his partner, Detective Sampin. Officer Hartz stated that they entered the residence at 2502 West Division, but they did not have a warrant to search or a warrant to arrest someone at that location.

Officer Hartz stated that his partner recovered contraband from the common area stairwell. He described the building as a commercial building with a law firm on the main level and an apartment upstairs. There is a solid glass door and stairs that lead to the second level.

Officer Hartz stated that he believed there was a doorway at the top of the stairs on the second level. Officer Hartz later conceded that there was no common area at that location, but instead the stairs led straight into the apartment.

Officer Hartz stated that he saw defendant inside the residence of 2502 West Division. Officer Hartz and his partner took defendant into custody. Following Officer Hartz's testimony, defendant rested.

The State called Detective Sayam Sampin to testify. Detective Sampin testified that on August 30, 2002, he was a police officer with the Chicago police department. At the time of the hearing, he was a detective.

On August 30, 2002, at about 2 a.m., Detective Sampin was on duty with his partner, Officer Hartz. They were on patrol in a marked car and in uniform. Detective Sampin was the passenger in the car while Officer Hartz was driving. At that time, they received a call of shots fired in the area of Division and Campbell. Detective Sampin is familiar with the area and understood it to be an area of high-crime activity with multiple gangs in the area. The officers proceeded to that location after the call of shots fired.

The officers did not have a description for who was firing the shots so they toured the area in the car. Detective Sampin observed a lot of gang members on the street from the "Cobra faction." Detective Sampin stated that no one approached their car while they drove around the area. He said usually when Cobra gang members have been shot at, they come up and tell him what the car looked like and in what direction they went. Since no one came up to Detective Sampin that time, he believed that it was possible that the shooter was one of them.

3

1-05-0106

While they were driving around, Detective Sampin saw a flash of movement in an alley. He asked his partner to let him out so he could check out the alley. He got out of the car just north of Division on Campbell. Detective Sampin went to the intersection of Division and Campbell to set up surveillance. He put himself in a position where he could see west down Division from Campbell. Initially, Detective Sampin got behind some parked cars, but he was exposed from the back. Then, he got between two parked cars. He was located east of 2502 West Division. He was approximately 35 feet away.

Detective Sampin saw an individual stick his head out of the door of 2502 West Division, look both ways, and then step out onto the sidewalk. Detective Sampin stated that his line of sight was clear and the street was pretty bright from streetlights. Detective Sampin identified defendant as the person who came out of 2502 West Division.

Shortly thereafter, a gold vehicle pulled up and defendant immediately went to it. The gold vehicle stopped directly in front of 2502 West Division. Defendant went to the passenger side of the vehicle. Detective Sampin saw two individuals inside the car and one was in the rear seat of the passenger side. Detective Sampin observed that individual pass a gun out of the open car window to defendant. Defendant took the gun, turned it around, pulled up his shirt, and tucked the gun into the waistband of his pants. Defendant continued to talk to the people in the car. At this point, Detective Sampin radioed his partner to come pick him up.

Detective Sampin broke his surveillance to get back into the car with his partner. Once in the car, Detective Sampin immediately told his partner that there was a gold vehicle around the corner and someone in the car passed a gun to a man standing outside. They went around the

4

corner and saw the gold car in the same position and defendant was still standing next to it. Both officers exited the car. Detective Sampin started to approach defendant and asked him to "come here." Defendant looked at him and turned around. As Detective Sampin continued to approach, defendant started to run for the door of 2502 West Division. Detective Sampin ran after defendant to the door of 2502 West Division.

Detective Sampin described the door as having a metal frame with a window from top to bottom and a push bar in the center. Defendant got inside the door first. Defendant turned and tried to slam the door in Detective Sampin's face, but Detective Sampin was partially in the door. Defendant continued to push the door shut as Detective Sampin tried to push it open. Detective Sampin was pushing with one hand because he had his gun in his other hand. Officer Hartz ran up to help Detective Sampin. At first, defendant was pushing with one hand on the door while his other hand was on his waistband, but when Officer Hartz came to help, defendant began to push with both hands. Defendant then got the door to close. Detective Sampin then kicked the glass part of the door, and the window shattered. During the struggle at the door, Officer Hartz called out that there was a gun in defendant's pants.

Defendant began to run up the stairs. Detective Sampin ducked under the push bar and got inside the building. Both defendant and Detective Sampin stumbled up the stairs. When defendant was about halfway up the stairs, Detective Sampin saw defendant throw a gun to the side. Detective Sampin grabbed the gun and continued to pursue defendant. Detective Sampin stated that there was a short foot chase through the apartment onto the back porch. Defendant ended up in a dead end. When Detective Sampin got to the back porch, defendant was crawling

on the couch to get behind or under it.

Detective Sampin stated that he knew defendant from the neighborhood, but had never arrested him before that date.

On cross-examination, Detective Sampin stated that he did not talk to anyone on the street regarding the call of shots fired because no one initiated contact, which is what normally happens. Detective Sampin said he did not see that anyone had been shot. Detective Sampin testified that he set up his surveillance so he could look west down Division, and he told his partner to take the marked police car out of sight. Detective Sampin said that he was in his surveillance position for 6 to 10 minutes before he saw defendant. Defense counsel asked Detective Sampin if a silver four-door Honda pulled up in front of 2502 West Division, but Detective Sampin stated that it was a goldish color and that he did not know if it was a Honda. He did not know the model or make. Detective Sampin denied calling dispatch and giving a description of a silver Honda. Detective Sampin testified that he saw a gold-colored vehicle with two male Hispanics inside, but he did not get a chance to look at the license plate. Detective Sampin denied telling dispatch of a car with a possible license plate of 336558.

Detective Sampin said he focused more on defendant than on the vehicle because defendant had a gun. When Detective Sampin called to defendant and asked defendant to come toward the detective, Detective Sampin did not ask defendant to drop the weapon because the weapon was not in defendant's hands. Detective Sampin said that after he called for his partner to pick him up, he "duckwalked, almost crawled" away from defendant so that he would not be seen. He admitted that he could not see defendant when he reached his partner and the car.

1-05-0106

Detective Sampin testified that he did not have the recovered gun sent to the Illinois State Police crime lab for fingerprint testing. Detective Sampin denied that defendant was kicked or beaten. Detective Sampin stated that he struggled with defendant at the door and both men fell on the stairs. Then, Detective Sampin had to wrestle with defendant when he tried to make the arrest because defendant would not submit.

The parties entered into a stipulation that defendant had two prior felony convictions for possession of a controlled substance and one prior felony conviction of sale or delivery of a controlled substance. Following arguments, the trial court held that there was probable cause to believe that a crime was being committed and there were exigent circumstances that allowed the officer to enter the residence. Accordingly, defendant's motion to quash arrest and suppress evidence was denied.

At defendant's October 2004 jury trial, Officer Hartz and Detective Sampin testified to substantially the same facts as at the suppression hearing. Additionally, Officer Hartz stated that after Detective Sampin got back into the car and they went to 2502 West Division, he parked the car to block the gold vehicle and keep it from leaving. When he and Detective Sampin approached defendant and the gold vehicle, he asked the driver of the vehicle to turn off the car. After Detective Sampin got into the building after defendant, Officer Hartz saw the driver of the gold vehicle start the engine, jump the curb, and speed off. When Officer Hartz went to the apartment, he saw Detective Sampin with his knee on defendant's back and defendant was resisting arrest.

Officer Hartz also stated on cross-examination that defendant made a statement at the

7

police station that he had the gun for protection. When asked by defense counsel what that statement meant, Officer Hartz said he did not ask defendant, but Officer Hartz stated "in [his] career, [he has] seen a lot of gang bangers and gang members with guns carry guns [sic] for their protection."

Both Officer Hartz and Detective Sampin identified the gun presented by the State as the gun they had seen in defendant's possession. The State entered a stipulation that prior to August 30, 2002, defendant was convicted of a felony. The State then rested. The defense moved for a directed verdict, which the trial court denied.

Willie Rosado testified for the defense. Rosado stated that he is defendant's brother. Rosado testified that he lives at 2502 West Division. Rosado stated that, from the street, there is only one door to the building. He said that once a person goes through the door and up the stairs, he would enter the apartment. He stated that there is not a door between the apartment and the staircase.

At about 2:30 a.m. on August 30, 2002, Rosado was in front of his house clearing out the apartment. There had been a party at his house that night for his niece's birthday and he was directing people to leave. Defendant was going to spend the night at Rosado's apartment. At this time, defendant was upstairs helping clean up the apartment.

While Rosado was outside, a police car pulled up at the corner of Division and Campbell. Rosado denied that a gold car was parked on the street. Rosado stated that the police exited the car and came up to his door. Rosado was standing about five feet away from the door. He saw one officer pull out a gun and tell people to stand back. Rosado said the officer kept banging on

8

the glass until it broke. One officer went in through the broken door window. Rosado testified that about 15 other officers came to the scene at that time. Rosado said he could hear his brother yelling upstairs. Rosado did not see what was happening. Rosado stated that the officers were upstairs for five to seven minutes. He later saw defendant when the officers led him downstairs. Rosado said that the officers were dragging defendant down the stairs and defendant was handcuffed.

Rosado denied seeing defendant with a gun that day. Rosado testified that defendant's legs were bruised and red when he was taken out of the building by the police.

During deliberations, the jury sent out two notes. The first note stated, "The jury cannot come to an unanimous verdict [sic], and will not be able to." The parties agreed that the trial court should instruct the jury to keep deliberating. The second note was sent out 10 minutes later and said, "We need a definition of reasonable doubt, please." The parties agreed with the trial court that pursuant to the Illinois Pattern Jury Instructions committee notes, no instruction should be given. The trial court told the jurors that they had heard the evidence, had been given instructions, and please continue to deliberate. About one hour later, the jury reached a verdict and found defendant guilty of aggravated unlawful use of a weapon and unlawful use of a weapon by a felon.

At defendant's November 2004 sentencing hearing, the trial court considered evidence presented in aggravation and mitigation. The trial court sentenced defendant to six years' imprisonment and merged the two counts. Defendant was also ordered to pay $619 in fines, fees and costs.

9

1-05-0106

This appeal followed.

Defendant first argues that he was not proven guilty beyond a reasonable doubt because the testimony of Detective Sampin and Officer Hartz was "so incredible that it defied logic." Defendant contends that the officers' version of the events is "suspect" because they did not follow proper police procedures and this makes their story less plausible. The State maintains that a rational trier of fact could easily have found defendant guilty.

When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. People v. Hall, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); accord People v. Cox, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

It follows that where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. In conducting this inquiry, the reviewing court must not retry the defendant. People v. Cunningham, 212 Ill. 2d 274, 279-80 (2004). The reviewing court must carefully examine the record evidence while bearing in mind that it was the

10

fact finder who saw and heard the witnesses. Cunningham, 212 Ill. 2d at 280. Testimony may be found insufficient under the Jackson standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. Cunningham, 212 Ill. 2d at 280. However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so. Reasonable people may on occasion act unreasonably. Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. Cunningham, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. Hall, 194 Ill. 2d at 330.

To be found guilty of aggravated unlawful use of a weapon, the State must prove that: (1) the defendant knowingly carried a firearm on or about his person, (2) the defendant was not on his own land or in his abode or fixed place of business, and (3) the firearm is uncased, loaded and immediately accessible at the time of the offense. 720 ILCS 5/24-1.6 (West 2000). The elements that the State must establish for unlawful use of a weapon by a felon are: (1) the defendant knowingly possessed a firearm, and (2) the defendant had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2000).

Here, if we view the evidence presented at trial in the light most favorable to the prosecution, all the elements of both charges were established beyond a reasonable doubt. Officer Hartz and Detective Sampin testified that they responded to the area of Division and Campbell after a call of shots fired. After patrolling the area for a few minutes, Detective

Sampin exited the car to set up surveillance. Detective Sampin testified that during his surveillance he witnessed defendant receive a gun from an occupant of a car and then tuck it into the waistband of his pants. He stated that he was approximately 35 feet away from defendant, his view was unobstructed and well lit due to artificial lights. Once Detective Sampin observed defendant's receipt of a gun, he called for his partner, Officer Hartz. Although Detective Sampin lost sight of defendant for a brief time, Officer Hartz later saw the gun in defendant's waistband as he struggled with Detective Sampin at the door to 2502 West Division. As Detective Sampin chased defendant up the stairs at that location, he saw defendant throw the gun to the side. Detective Sampin recovered the gun from the stairway. Detective Sampin testified at trial that the gun was loaded at the time of recovery. Both officers identified the gun at trial as the one they saw in defendant's possession.

The State entered into a stipulation that defendant had a prior felony conviction. Additionally, defendant's brother testified that while he lived at 2502 West Division, defendant did not live there. This evidence established that defendant was in possession of a loaded, uncased gun while he was not at his residence and that he was previously convicted of a felony. The State provided evidence on each element of the two charges.

However, defendant contends that "[i]t would be impossible to see actions occurring at the level of a car window when Sampin was down on the ground underneath a car" and that the two officers' testimony was unbelievable because they did not follow proper procedure and stop the gold car from leaving the scene. We disagree with defendant and do not find the testimony of Detective Sampin and Officer Hartz to be implausible and unbelievable. While there may be

12

minor inconsistencies, each officer's testimony corroborated the other's and nothing in the record contradicts their version of the events on August 30, 2002. Nothing was presented to suggest that Detective Sampin's view was obstructed by either lighting or distance. As a court of review, we are to consider the evidence presented at trial in the light most favorable to the prosecution, and we find that a rational trier of fact could have found the evidence sufficient to support a guilty finding.

The next issue is whether defendant was denied a fair trial because Officer Hartz's testimony labeled defendant a gang member when no evidence was presented that defendant was in a gang. Defendant concedes that this issue was not preserved for review because it was not objected to at trial, but contends that the plain error rule applies and allows for review. The State responds that this issue has been waived on appeal and plain error does not apply.

A defendant's failure to object at trial and to raise the issue in a posttrial motion operates as a waiver of the right to raise the issue as a ground for reversal on review. People v. Harvey, 211 Ill. 2d 368, 385 (2004). We note that waiver is a limitation on only the parties, and despite waiver, this court may address an issue in order to carry out its responsibility to reach a just result. People v. Carmichael, 343 Ill. App. 3d 855, 859 (2003). Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). Under the plain error rule, issues not properly preserved may be considered by a reviewing court under two limited circumstances: (1) where the evidence is closely balanced, so as to preclude argument

13

that an innocent person was wrongfully convicted; or (2) where the alleged error is so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process. People v. Hall, 194 Ill. 2d 305, 335 (2000).

Defendant asserts that the first prong of the plain error rule applies. Under the first prong, the defendant must prove "prejudicial error." That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced but rather strongly weighed against the defendant. People v. Herron, 215 Ill. 2d 167, 187 (2005).

Defendant argues that the evidence was closely balanced because the jury indicated that it was unable to reach a verdict and the outcome relied on the credibility of the police officers in comparison to defendant's witness. In People v. Smith, 341 Ill. App. 3d 530, 543 (2003), this court held that a jury's difficulty in reaching a verdict is but a single factor in determining whether the evidence was closely balanced. In that case, the reviewing court found that "four hours was not a long enough interval to consider the jury deadlocked" considering the evidence to review. Smith, 341 Ill. App. 3d at 543. The Smith court reviewed the evidence against the defendant and found it to be overwhelming, and the jury's deliberations alone did not establish that the evidence was closely balanced. Smith, 341 Ill. App. 3d at 543.

Here, the State presented the testimony of two police officers who observed defendant with a loaded gun. Detective Sampin, while on surveillance, watched defendant receive and take possession of the gun. Detective Sampin later recovered that gun after defendant discarded it

during a pursuit. Officer Hartz also saw the gun tucked into defendant's waistband during the struggle at the door of 2502 West Division. The only witness that defendant presented was his brother, who stated that defendant never came outside and the police just arrived at the scene, smashed the door, entered the building and arrested defendant without provocation.

We find that the evidence against defendant was not closely balanced. The evidence clearly established defendant's guilt. The mere fact that jury indicated in one note that it could not reach a decision does not render the evidence closely balanced. Additionally, the only witness presented to challenge the testimony of the officers was defendant's half-brother and Rosado's testimony was impeached by virtue of his close personal relationship with defendant. People v. Cosme, 247 Ill. App. 3d 420, 429 (1993). Since the evidence was not closely balanced, we decline to apply the plain error rule and find that this issue was waived. As we point out later in this decision, this isolated comment, which was not specifically related to defendant, is not the type of error to warrant review under the second prong of plain error.

The next argument raised by defendant is that the trial court erred in not giving the jury a definition for reasonable doubt when they requested one during deliberations. The State responds that this issue has been waived because defendant did not object to the trial court's refusal to define reasonable doubt at the jury's request at trial or in a posttrial motion.

A defendant's failure to object at trial and to raise the issue in a posttrial motion operates as a waiver of the right to raise the issue as a ground for reversal on review. People v. Harvey, 211 Ill. 2d 368, 385 (2004). As noted above, a waiver is a limitation on only the parties, and despite waiver, this court may address an issue in order to carry out its responsibility to reach a

15

just result. People v. Carmichael, 343 Ill. App. 3d 855, 859 (2003). The State maintains that defendant has forfeited this issue by failing to raise the issue at trial or in a posttrial motion and that it does not qualify as plain error.

The pattern jury instructions state in a committee note for Illinois Pattern Jury Instructions, Criminal, No. 2.05 (4th ed. 2000) (hereinafter IPI Criminal 4th) that "The Committee recommends that no instruction be given defining the term 'reasonable doubt.' " IPI Criminal 4th, No. 2.05, Committee Comment. The Illinois Supreme Court has held that "[t]he law in Illinois is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." People v. Speight, 153 Ill. 2d 365, 374 (1992), citing People v. Cagle, 41 Ill. 2d 528, 536 (1969); People v. Malmenato, 14 Ill. 2d 52, 61 (1958).

Defendant argues that neither the IPI committee nor the supreme court has considered what should be done when a jury specifically asks for a reasonable doubt definition and urges this court to find it is appropriate to give the definition under that circumstance. The State disagrees and points out that this issue has already been considered by the Fourth District.

In People v. Failor, 271 Ill. App. 3d 968, 969-70 (1995), the defendant was charged with two counts of aggravated criminal sexual assault, and during deliberations, the jury sent out a note requesting a definition of reasonable doubt. The prosecutor asked the trial court to refrain from giving a definition. The defense counsel did not object and agreed with the prosecutor that " '[w]hatever [the jury] decide[s] reasonable doubt is, is what it is.' " Failor, 271 Ill. App. 3d at 970. The trial court instructed the jury that " '[t]he above matter is for the jury to determine' " and to continue deliberations and to review the previously given instructions. Failor, 271 Ill.

16

App. 3d at 970.

On appeal, the defendant contended that the trial court erred by refusing to give a reasonable doubt instruction after the jury requested it. The reviewing court pointed out that the Illinois Supreme Court has consistently held that neither the trial court nor counsel should define reasonable duty and that the IPI does not provide a definition for reasonable doubt, which indicates that none should be given. Failor, 271 Ill. App. 3d at 970; see also Speight, 153 Ill. 2d at 374; Cagle, 41 Ill. 2d at 536; Malmenato, 14 Ill. 2d at 61; IPI Criminal 4th No. 2.05. The defendant contended that Illinois courts should reassess their position in light of the United States Supreme Court decisions in Sullivan v. Louisiana, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078, (1993), and Victor v. Nebraska, 511 U.S. 1, 127 L. Ed. 2d 583, 114 S. Ct. 1239 (1994). Failor, 271 Ill. App. 3d at 970-71. The Failor court held that the law in Illinois is clear and declined the defendant's invitation to disregard it. Accordingly, the court concluded that the trial court did not err when it refused to define reasonable doubt upon the jury's request. Failor, 271 Ill. App. 3d at 971.

Similarly, in People v. Tokich, 314 Ill. App. 3d 1070, 1075 (2000), the Fourth District was confronted with the same issue as in Failor, and it declined to find an exception to the well-established law in Illinois not to define reasonable doubt when the jury requests a definition.

Defendant contends that under People v. Childs, 159 Ill. 2d 217, 233 (1994), a jury is entitled to have its explicit legal questions answered and that includes being given a definition of reasonable doubt. Defendant asserts that this precise issue has not been considered in light of Childs.

1-05-0106

In People v. Childs, the jury sent out a note during deliberations and the bailiff called the trial judge at a time when the judge was having lunch with assistant State's Attorneys. The judge told the bailiff what response to give and then told the prosecutors what the jury had asked and the response. No attempt was made to contact the defense attorney. Childs, 159 Ill. 2d at 225. Upon returning to court, the defendant's attorney was informed of the note and the response. The defendant's attorney objected. Subsequently, the defendant was found guilty of murder and armed robbery. Childs, 159 Ill. 2d at 225-26. The appellate court reversed the defendant's conviction, ruling that defendant was prejudiced by the trial court's *ex parte* response to the jury's question. Childs, 159 Ill. 2d at 226.

The question posed by the jury in Childs did not involve a definition of reasonable doubt, but instead asked "whether defendant could be found guilty of armed robbery and either voluntary or involuntary manslaughter, or if a finding of guilt of armed robbery mandated a 'guilty of murder' verdict." Childs, 159 Ill. 2d at 229. The supreme court found that the State failed to sustain its burden of proving that the trial court's improper *ex parte* communication to the jury was harmless beyond a reasonable doubt, because its position

> "ignore[d] several fundamental principles: (1) a jury is entitled to
> have its explicit legal questions answered; (2) the trial court has an
> obligation to seek clarification of the source of the jury's confusion
> if the question is unclear, and to then attempt to clarify the matters
> of law about which the jury has manifested confusion; (3) because
> jury deliberations are a critical stage of trial affecting substantial

rights, a defendant has an absolute right to be informed of any jury question involving a question of law and to be given the opportunity to participate for his protection in fashioning an appropriate response; (4) to sustain the jury's verdict following an improper *ex parte* communication between the judge and the jury, it must be apparent that no injury resulted from the *ex parte* communication; and (5) the burden is on the prosecution, not the defendant, to prove that any error in the giving or the substance of the ex parte response to a jury inquiry is harmless beyond a reasonable doubt." Childs, 159 Ill. 2d at 233-34.

Although we concur with the Childs decision, we do not agree with defendant's claim that the jury's right to have its questions answered trumps the long-standing position in Illinois to define reasonable doubt. Moreover, defendant asserts that the decisions in Failor and Tokich lack merit because they discussed supreme court case law before Childs. However, both decisions were issued after Childs, and the Illinois Supreme Court denied leave to appeal in both cases. See People v. Failor, 163 Ill. 2d 570 (1995); People v. Tokich, 191 Ill. 2d 556 (2000).

The problem with defendant's analysis is that Childs does not discuss reasonable doubt at all. It does not consider the issue defendant poses on appeal. Additionally, Childs was not a case about a jury's right to have its questions answered; rather, it concerned a defendant's right to be informed of a jury's question. For these reasons, the supreme court's decision in Childs is easily distinguishable from the instant case.

1-05-0106

We agree with the Fourth District's holdings in <u>Failor</u> and <u>Tokich</u>. The Illinois Supreme Court has consistently held that reasonable doubt should not be defined by either trial judges or attorneys. The trial court in this case was correct in adhering to this precedent. Therefore, even if we were to review this under the plain error rule, we would find there was no error.

Next, defendant asserts that his trial counsel was ineffective because: (1) he failed to impeach both officers at the suppression hearing and at trial with their arrest report; (2) he failed to argue that the officers' testimony was incredible at the suppression hearing; (3) he did not move to strike Officer Hartz's statement that defendant was a "gang banger"; (4) he failed to perfect impeachment of Detective Sampin at the suppression hearing regarding an alleged radio transmission that contradicted his testimony; and (5) he acquiesced in the trial court's decision not to give the jury a definition for reasonable doubt. The State maintains that defendant failed to establish that his trial counsel's representation was inadequate and that the inadequate performance substantially prejudiced him.

In <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct 2052 (1984), the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under <u>Strickland</u>, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. <u>Strickland</u>, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's

20

performance. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Defendant's first claim of ineffective assistance is that his trial counsel failed to question the officers about their arrest report. The arrest report, signed by Detective Sampin, states:

"In summary, above arrested on signed complaints in that the above offender a known felon whom R/Os [reporting officers] observed with a blue steel semi-automatic pistol loaded with 14 live rounds. Above offender fled from R/Os and threw the pistol onto the stairs. Fleeing from R/Os he was apprehended after a short foot chase. Weapon inventoried in 014 District. As offender fled from A/Os [arresting officers] he fell several times as he stumbled up the stairs."

Defendant contends that his trial counsel was ineffective because he did not impeach both officers regarding the portion of the report that stated "above arrested on signed complaints" and the lack of important details in the report, such as defendant's receipt of the gun from an individual in a gold car, that one of the officers asked defendant to "come here," and that defendant struggled with the officers at the door of 2502 West Division. In defendant's opinion,

21

a reasonable police officer would have included such details in his arrest report. Defendant says that any failure to impeach the officers with their arrest report affected the trial court's decision at the suppression hearing and the jury's verdict at trial.

The State responds that the statement that "above arrested on signed complaints" refers to the complaint for preliminary examination that Detective Sampin prepared on August 30, 2002. The State also points out that the arrest report does not contradict the officers' testimony and the missing details do not amount to inconsistencies that should have been provided to the jury.

As the State notes, defendant does not cite any authority to support his argument that an arrest report requires more details than what was provided by Detective Sampin. Defendant cannot show that his trial attorney's failure to impeach the officers with the arrest report so prejudiced him that the result of the proceeding would have been different. The lack of details did not render the officers' testimony inconsistent, and defense counsel was not ineffective for failing to impeach the officers about the absent details.

Defendant also contends that his trial counsel was ineffective because he failed to argue the credibility of the officers at the suppression hearing. However, the State points out that at the suppression hearing, defendant's trial counsel proceeded under a legal argument that defendant was an overnight guest at his brother's residence and, therefore, the police needed a warrant. Defendant's trial counsel asserted that since Detective Sampin lost sight of defendant for a brief period of time, he did not know whether defendant had a weapon and was committing a crime. This was a sound legal strategy at the hearing on defendant's motion to quash arrest and suppress evidence.

In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. People v. Giles, 209 Ill. App. 3d 265, 269 (1991). Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently suggests the trial lawyer was incompetent. People v. Young, 341 Ill. App. 3d 379, 383 (2003). A decision that involves a matter of trial strategy typically will not sustain a claim of ineffective representation. People v. Simmons, 342 Ill. App. 3d 185, 191 (2003).

Defendant's trial counsel presented a reasonable and sound legal argument at the suppression hearing; that defendant would have raised a different argument does not render his representation ineffective. We do not find that defendant's trial counsel was ineffective for failing to argue the officers' credibility at the suppression hearing.

Defendant also claims his trial counsel was ineffective for failing to ask the court to strike Officer Hartz's testimony that defendant was a "gang banger." Defendant contends that this statement was highly prejudicial and failing to object to the testimony was ineffective assistance.

At trial, Officer Hartz testified that defendant told the officer that he was carrying the gun for protection. The following colloquy took place during Officer Hartz's cross-examination:

> "MR. ADAM [Defense Counsel]: Did you ask him, Freddy,
>
> we just saw you receive the gun, how could you be carrying it for
>
> protection? Did you ask him that?
>
> OFFICER HARTZ: I don't recall asking him that, no.

MR. ADAM: Didn't it strike you as odd a man would confess to saying I carry a gun, you or your partner just witnessed himself, doesn't that strike you as funny?

OFFICER HARTZ: No. In my career, I have seen a lot of gang bangers and gang members with guns carry guns for their protection."

The State counters that this statement was not highly prejudicial because Officer Hartz did not specifically label defendant as a gang member. Rather, Officer Hartz was merely explaining that in his experience it was not unusual for him to encounter people who carry guns for protection.

While defendant argues that this alleged error was of such a magnitude as to deny defendant a fair trial, we find that the statement does not establish sufficient prejudice that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. First, the statement does not directly label defendant as a gang member, as he asserts on appeal. Additionally, this one statement is the only mention of gangs at defendant's trial. This isolated comment, which does not relate specifically to defendant, would not have changed the outcome of the trial. As previously stated, we have found that the evidence was not closely balanced and do not believe that this one statement would have resulted in defendant's acquittal. Since defendant cannot show prejudice, this claim of ineffective assistance must fail.

Defendant next contends that his trial counsel was ineffective for failing to perfect the

impeachment of Detective Sampin at the suppression hearing. Specifically, defendant argues that his trial counsel questioned Detective Sampin on cross-examination about an audio transmission sent over police radio that contradicted his testimony, but he failed to produce any evidence that the transmission existed.

At the suppression hearing, defendant's attorney asked Detective Sampin about an alleged call to dispatch regarding a silver, four-door Honda with a possible license plate of 336558. Detective Sampin denied making a radio call, stated that the car was gold, and stated that he was unable to determine the make, model or license plate.

Defendant relies on People v. Williams, 333 Ill. App. 3d 204, 209-11 (2002), to support his argument that when an attorney attempts to impeach a witness, then he must perfect the impeachment when the witness denies the impeachment allegation. However, the issue presented in Williams was whether a defendant was prejudiced by the State's failure to perfect its impeachment of the defendant after it implied a motive, but failed to substantiate its line of impeachment with substantive evidence. Williams, 333 Ill. App. 3d at 209-11. The reviewing court held that such unperfected impeachment was reversible error because the unsubstantiated line of questioning destroyed the defendant's credibility and he was the only witness to testify on his behalf. Williams, 333 Ill. App. 3d at 211. Further, as the Williams court noted, " '[t]he danger inherent in such questioning is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question.' " Williams, 333 Ill. App. 3d at 210, quoting People v. Enis, 139 Ill. 2d 264, 297 (1990).

Here, the alleged ineffectiveness is based on defense counsel's failure to produce some

evidence of a radio transmission that contradicted Detective Sampin's testimony at the suppression hearing. Defendant does not offer such evidence in the record on appeal as proof that his attorney had such evidence, but failed to use it. Rather, defendant speculates that such a recording existed and his attorney should have presented it. Additionally, the harm to be protected under Williams, namely, to keep the fact finder from presuming the insinuation of impeachment and the loss of credibility without substantiation, is not present in this case. If the trial court at the suppression hearing were to assume that Detective Sampin did not correctly recall the night of August 30, 2002, then it would benefit defendant and harm the prosecution.

Defendant failed to argue how this alleged prejudice would have changed the result of the proceedings. Even if Detective Sampin's recollection was wrong regarding the color and make of the car, it does not alter the fact that Detective Sampin witnessed defendant receiving and taking possession of a gun and the later recovery of that gun after defendant threw it aside. This impeachment does not contradict the substance of Detective Sampin's testimony, and we do not believe that defendant was prejudiced so that the outcome of the case is uncertain.

Defendant's final claim of ineffective assistance of counsel is that his trial counsel was ineffective for failing to object to the trial court's decision not to define reasonable doubt for the jury. Since the Illinois Supreme Court has held that no definition of reasonable doubt should be given and we have already held that the trial court did not err by refusing to define reasonable doubt, defendant's trial counsel was not ineffective for following the established case law in this state. Accordingly, defendant's trial counsel was not ineffective for adhering to Illinois case law that a definition of reasonable doubt should not be given to a jury.

1-05-0106

Additionally, defendant argues that he is entitled to a reduction in the total amount of fines imposed because (1) the $4 criminal/traffic conviction surcharge is a fine and the $20 fine for the Violent Crime Victim Assistance can only be imposed if no other fines are imposed; and (2) he is entitled to a credit for the $4 criminal/traffic conviction surcharge from his presentence credit.

Defendant asserts that the $20 fine for the Violent Crime Victims Assistance Fund (725 ILCS 240/10(c)(2) (West 2004)) was erroneously imposed because the trial court also imposed a $4 fine for the Traffic and Criminal Conviction Surcharge Fund (730 ILCS 5/5-9-1(c-9)(West 2004),[1] and the $20 fine may only be imposed if "no other fines" are imposed (725 ILCS 240/10(c)(2) (West 2004)).  This issue presents a question of statutory construction.  The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature and that inquiry begins with the plain and ordinary meaning of the statute.  People v. Campa, 217 Ill. 2d 243, 252 (2005).

Section 10(c)(2) of the Code of Criminal Procedure of 1963 ( Code) states, in relevant part:

> "(c) When any person is convicted in Illinois on or after
>
> August 28, 1986, *** and no other fine is imposed, the following
>
> penalty shall be collected by the Circuit Court Clerk:
>
> ***

[1] We note that the $4 additional penalty was eliminated by the legislature in Public Act 94-652 and replaced with "(Blank)."  Pub. Act 94-652, eff. August 22, 2005.

(2) $20, for any other felony or misdemeanor,

excluding any conservation offense." 725 ILCS

240/10(c)(2) (West 2004).

Section 5-9-1(c-9) of the Unified Code of Corrections (Code of Corrections) provides, in

relevant part:

"There shall be added to every fine imposed in sentencing

for a criminal *** offense, *** an additional penalty of $4

imposed. *** Such additional penalty of $4 shall be assessed by

the court imposing the fine and shall be collected by the circuit

clerk in addition to any other fine, costs, fees, and penalties in the

case. *** The additional penalty of $4 shall be in addition to any

other fine, costs, fees, and penalties and shall not reduce or affect

the distribution of any other fine, costs, fees, and penalties." 730

ILCS 5/5-9-1(c-9)(West 2004).

This court has recently considered this issue in People v. Jamison, 365 Ill. App. 3d 778

(2006), and People v. Jones, No. 1-05-0020 (June 23, 2006). In Jamison, the court found that the

defendant was misconstruing the nature of the $4 additional penalty in section 5-9-1(c-9).

Jamison, 365 Ill. App. 3d at 780. After considering the relevant statutory language, the Jamison

court found that "the plain language of the statute provides that the $4 assessment is an amount

to be surcharged as an additional penalty; it is considered *after* the imposition of any basic fines

provided for by other legislation." (Emphasis in original.) Jamison, 365 Ill. App. 3d at 780. The

court concluded that "after the imposition of the $20 fine, an additional penalty of $4 was surcharged, and did not reduce or affect the distribution of the $20 fine." Jamison, 365 Ill. App. 3d at 780–81.

In Jones, the court found that the fine was improperly imposed since two other fines had been imposed; a $500 controlled substances assessment and the $4 traffic and criminal conviction surcharge. Jones, slip op. at 12. However, the Jones court did not acknowledge the finding in Jamison on this issue nor did it consider, as the court in Jamison did, that the $4 additional penalty is added after the imposition of other fines.

We have reviewed the decisions in both Jamison and Jones, and find the decision in Jamison to be more persuasive. The statutory language of section 5-9-1(c-9) clearly explained that the $4 additional penalty was not meant to affect the imposition of other fines, which is what defendant is asking on appeal. If we were to find that the $4 additional penalty prevented the imposition of the $20 Violent Crime Victims Assistance Fund fine, then we would be ignoring the language of the statute. Accordingly, the trial court properly imposed both the $20 Violent Crime Victims Assistance Fund fine and the $4 additional penalty.

Defendant also contends that the $4 additional penalty should be offset by his presentence credit. It is not contested that defendant was in custody for 61 days. Defendant did not raise this issue before the trial court, but the normal rules of waiver do not apply and a defendant may raised the issue of credit on appeal even if not raised in the trial court. See People v. Woodard, 175 Ill. 2d 435, 457-58 (1997).

Section 110-14(a) of the Code provides:

"Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant. However, in no case shall the amount so allowed or credited exceed the amount of the fine." 725 ILCS 5/110-14(a) (West 2004).

This issue was also addressed in both Jamison and Jones. The Jamison court noted that the plain language of section 110-14 provides that the credit is limited to "fines" and does not apply to any other amount such as costs or fees, but it "does not explicitly provide for credit against such an 'additional penalty.' " Jamison, 365 Ill. App. 3d at 781. The court stated that in order to resolve the issue, they had to determine whether the legislature intended the penalty to be treated as a fine or something else, such as a cost or fee. Jamison, 365 Ill. App. 3d at 781. Quoting Black's Law Dictionary, the Jamison court noted that a "penalty" is defined as a " '[p]unishment imposed on a wrongdoer, esp. in the form of imprisonment or fine.' " Jamison, 365 Ill. App. 3d at 781, quoting Black's Law Dictionary 1153 (7th ed.1999). The court concluded because there is no indication that the legislature intended to depart from the plain meaning of the statute, the "additional penalty" provided for in section 5-9-1(c-9) is a pecuniary punishment in the nature of a fine . Jamison, 365 Ill. App. 3d at 782. Accordingly, the court modified the defendant's sentencing order to reflect the $4 credit.

The court in Jones agreed with Jamison, and held that pursuant to section 110-14, defendant may apply the $5-per-day credit to the $4 traffic and criminal conviction surcharge.

1-05-0106

<u>Jones</u>, slip op. at 11.

Likewise, we agree with <u>Jamison</u> that the $4 additional penalty is a fine, and therefore, defendant is entitled to a credit in the amount of $4.

Finally, defendant asserts that section 5-4-3 of the Unified Code of Corrections, which allows for the extraction and storage of the deoxyribonucleic acid (DNA) of convicted felons, violates his fourth amendment right to be free from unreasonable searches and seizures. Our supreme court recently rejected this particular claim and upheld the constitutionality of the statute in <u>People v. Garvin</u>, 219 Ill. 2d 104 (2006). Therefore, defendant's argument fails.

Based on the foregoing reasons, we affirm defendant's conviction and modify the sentencing order of the circuit court of Cook County to reflect the total amount of fines, fees, and costs of $615.

Affirmed as modified.

CAHILL and GARCIA, JJ., concur.