NOTICE

Decision filed 03/30/17. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2017 IL App (5th) 150046

NO. 5-15-0046

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 08-CF-1756 |
| | ) | |
| GARRETT ROTTAU, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justices Cates and Overstreet[*] concurred in the judgment and opinion.

**OPINION**

¶ 1     After a jury trial in the circuit court of Madison County, defendant, Garrett Rottau, was convicted of four counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008)) and sentenced to 32 years (8 years on each count) in the Department of Corrections, to be followed by 3 years of mandatory supervised release. The issues raised in this direct appeal are (1) whether the trial court erred in admitting the victim's out-of-court videotaped statements through Jessica Buhs, (2) whether the trial court erred in admitting the victim's out-of-court statement through the testimony of Stephanie Whitaker, (3) whether the

_____

[*]Justice Schwarm was originally assigned to participate in this case. Justice Overstreet was substituted on the panel subsequent to Justice Schwarm's retirement and has read the briefs and listened to the recording of oral argument.

1

trial court erred in prohibiting defense counsel from cross-examining the victim regarding certain entries made in notebooks, and (4) whether the trial court erred in sentencing defendant to 32 years in prison. We affirm and remand in part.

¶ 2                                    FACTS

¶ 3                                I. PRETRIAL

¶ 4     Prior to trial, a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2008)) was conducted to determine whether certain out-of-court statements were admissible. The evidence adduced at that hearing showed that the allegations defendant was having sex with the victim first surfaced on March 25, 2008, when the victim was 11 years of age. On that day, the victim's mother found a note the victim wrote that stated, "I am very sad right now. [Defendant] did it with me and my mother." Mindy Gutierrez, the victim's stepmother, testified that the victim was at her house for visitation when the victim received a phone call from her mother, Elizabeth, about the note. While Gutierrez did not see the note, she understood it indicated that defendant was having sex with both the victim's mother and the victim.

¶ 5     Initially, the victim denied anything was going on between her and defendant. However, 10 minutes later, the victim told Gutierrez she was having both oral and vaginal sex with defendant. As a result of the disclosure and a subsequent examination by a physician, the victim was scheduled for an interview with the Madison County Child Advocacy Center (CAC).

¶ 6     The night before the initial CAC interview, the victim recanted. When confronted about why she would lie, the victim explained defendant caught her masturbating and she was embarrassed. According to Gutierrez, the victim said she was "destroying her mother's life because her mother didn't have a place to stay after this came out. Her mom was sleeping in her

2

car and she felt that she destroyed her mother's life." Gutierrez testified the victim went to the CAC interview and, as far as she knew, the victim denied anything sexual had occurred between her and defendant.

¶ 7    After the allegations of sexual abuse surfaced, the victim went from having visitation with her father and Gutierrez to living with them full time. Defendant was to have no contact with the victim. Gutierrez said after the first CAC interview, things went mostly back to normal with the victim playing softball and hanging out with friends. The victim's mother would call and talk to the victim and her brother via phone. During one conversation, Gutierrez was walking past the victim's brother, who was supposedly talking to his mother, when she heard the brother say, "I love you too Garrett." When the phone call ended and the children came downstairs, Gutierrez confronted them about talking with defendant. Initially, both children denied it, but later admitted they talked to defendant after their mother put him on the phone.

¶ 8    Gutierrez and the victim's father then told the victim the lying needed to stop. Ultimately, the victim broke down, started crying, and admitted defendant did things to her. She admitted to having both vaginal and oral sex with defendant. Gutierrez and the victim talked for approximately two hours. When asked about specifics, Gutierrez responded, "I don't know where to start." Gutierrez then testified the victim told her about instances which occurred in the basement when defendant would send the victim's brother upstairs, a time when they had sex after pulling over on the side of the road, and instances of oral sex when defendant would make her swallow. The victim told Gutierrez the sex started in late September or early October 2007. Gutierrez said she and the victim discussed the matter approximately 20 or more times. The abuse was reported to the Department of Children and Family Services, and another CAC interview was scheduled.

3

¶ 9    Jessica Buhs, a former forensic interviewer and assistant director at CAC, testified about the two interviews she conducted with the victim. Both interviews were audio and video recorded. During the first interview, the victim denied any sexual conduct occurred. Buhs recalled that during the second interview, the victim disclosed "fondling of the breasts, vagina, buttocks. She described digital penetration of her vagina. She described penis to mouth contact; mouth to the vagina contact; and penis to vagina conduct." The parties agreed to provide the trial court with copies of both CAC interviews and allow the court to review those tapes outside their presence.

¶ 10    Buhs conducted the first interview of the victim on March 28, 2008. During the interview, the victim said she was at CAC because she blamed something on defendant. The victim said she was lying and that defendant had not done anything to her. She said she lied because defendant had caught her "fingering herself" and she was embarrassed. The victim said she learned about "fingering" from her friends with whom she made jokes about it. She equated fingering with what a male does when he "jerks off." Buhs and the victim discussed the note which was the impetus behind the investigation of defendant.

¶ 11    The victim said she found a sex toy on a recliner under the covers. She freaked out about it and threw it in her bedroom. She said she did not know what it was but learned it was a sex toy by a description on the back of the device. The victim's mom asked her what the note meant, and then her mom freaked out, claiming her life was ruined and defendant would go to prison for no reason. The victim said the note was a giant lie. The note she wrote was completely different from what she actually meant. The victim was unable to articulate what she really meant. Buhs told the victim it appeared to her that something was missing from the story.

4

¶ 12   The victim started crying and said she was trying to tell the truth. The victim said she had a crush on defendant and it was possible this was the reason she wrote the note. When she found the sex toy, she got sad because she thought defendant might have something to do with it. The victim noted that even her friends had a crush on defendant and that he is not a bad-looking guy. At the end of the interview, the victim asked Buhs, "Does it sound like I'm telling the truth?"

¶ 13   The second interview was conducted on April 21, 2008. During that interview, the victim told Buhs she previously lied and now claimed defendant did do something to her. The victim recalled the first time anything sexual occurred between her and defendant was about a year earlier after defendant got drunk watching a UFC fight. Defendant came into her bedroom, which was in the basement, and got in bed with her and tapped her on the back. He then took her out of the bedroom and onto a nearby couch where he touched her "private parts" (vaginal area), her "butt," and her "chest." He touched the top of her clothes. She told him to stop and he did. The next night he came back and touched her underneath her clothes. He then pulled down her pants and his pants and stuck his "private" in her "private." She showed Buhs on a diagram what she meant by "private," which was her vagina and his penis.

¶ 14   She said defendant did not beat her or hurt her. She said it hurt initially, but then she got used to it and it started to feel good. She knew it was wrong, but she started liking it. They eventually named his penis "Sponge Bob" after the victim's favorite television show and her private "Sandy," who is Sponge Bob's best friend in the cartoon. She said defendant sometimes used a condom and other times he would ejaculate in the corner of her bedroom. He would wipe it off the floor or rub it into the carpet. Sometimes when they had sex, her mother was home, and sometimes she was not. They had sex in her brother's bedroom on occasions when her mother was out of the house. She said they had sex in her mother's bedroom more than five times.

5

¶ 15    The victim also said defendant touched her with his hands, stuck his penis in her mouth, and would "shoot sperm" in there. He made her swallow it. She estimated this happened approximately five times. She also said defendant would put his mouth on her vagina, an act that occurred more than five times because he liked doing it. Defendant told the victim not to tell anyone about their sexual relationship and called it "their little secret." He told her if anyone found out, he could go to jail.

¶ 16    She recalled that the relationship started unraveling after she found a vibrator in a recliner. She drew a face with a frown on a note that stated defendant was having sex with her mom and not her. Her mom found the vibrator and the note in her room. According to the victim, her first sexual encounter with defendant occurred right before she started fifth grade. At the time of the second interview, she was in sixth grade. It happened two or three times per week until she was removed from the home.

¶ 17    The victim also told Buhs about two times she had sex with defendant in her mother's car. The incidents occurred on two separate occasions when defendant took her to St. Louis to purchase cigars at "Dirt Cheap." They were in the back seat, defendant told her to pull her pants down, and he bent her over and put his private in her private. Each time, defendant went outside the car and ejaculated. The victim also discussed having sex with defendant in a hotel room in Branson, Missouri, during a vacation when her mother took her younger brother swimming.

¶ 18    In response to Buhs's question as to why she lied, the victim explained that she lied during the first CAC interview because defendant "put things in her head," but now she was telling the truth because she was afraid defendant would pick younger girls and do to them what he did to her. The victim said she wanted defendant to go to jail because she does not want him

6

to do it to anyone else, but, on the other hand, she did not want him to go to jail because she has known him her whole life.

¶ 19    In addition to the two CAC interviews, the trial court allowed the victim's out-of-court statement to Stephanie Whitaker, a social worker from Children's Hospital in St. Louis, who interviewed the victim on March 25, 2008, after the victim was sent to Children's Hospital from Alton Memorial Hospital. The trial court determined that "the time, content, and circumstances provide sufficient safeguards for reliability pursuant to 725 ILCS 115-10." Thus, the trial court allowed Whitaker's report to be admitted into evidence at trial.

¶ 20                                   II. TRIAL

¶ 21                              A. STATE'S CASE

¶ 22                               1. TESTIMONY

¶ 23    The victim, age 18 at the time of trial, testified she graduated from high school with a 3.75 grade point average and was playing softball on a scholarship at a local community college. A couple of weeks after her tenth birthday, defendant came into her bedroom, got her out of bed, took her to an adjoining room, sat with her on a couch, and started touching her on her chest and crotch on the outside of her clothes. She told defendant to stop, and he did. The following night defendant came into her bedroom and started touching her underneath her clothes. He took off both her pants and his pants and put his penis in her vagina. Defendant then went into the corner of her bedroom and ejaculated. The victim said it hurt at first, but she got used to it.

¶ 24    The victim explained that her mother and father divorced when she was four years old. At the time of the abuse, she lived primarily with her mother and defendant, her mother's boyfriend, along with her younger brother. Her mother started dating defendant when the victim was nine. The week after she turned 10, she started her period. The victim was unaware what was

7

happening and was scared when she found blood in her underwear. She ran screaming into her mother's room, and her mother explained what she was experiencing. Defendant heard the conversation. The abuse started about a week later.

¶ 25    During this time, the victim spent two nights per week at her father's house. The victim estimated she had sex with defendant two or three nights per week. It usually occurred in her room in the basement, either after school before her mother came home from work or when defendant was supposed to be tucking her into bed. He would normally ejaculate in the corner of her bedroom on the carpet.

¶ 26    The victim also testified about other sexual acts. She said defendant would often put his fingers inside of her, usually while she was underneath a blanket. Defendant put his penis in her mouth and forced her to swallow after he ejaculated. Defendant performed oral sex on the victim. She said defendant performed oral sex more on her than she did on him. The victim further recalled having sex with defendant in a car while on the way to purchase cigars and another time in a hotel in Branson.

¶ 27    The victim testified eventually the sex became mutual and she began to want it. She said she cared about defendant in a way that was not normal for a 10-year-old. She knew it was wrong, and it made her feel "gross."

¶ 28    The victim also discussed the note found by her mother. She testified she wrote the note because she found her mother's vibrator and was upset because it made her realize defendant was having sex with both her and her mother. The victim felt betrayed by defendant. The victim put the note inside a box in which she kept other notes her friends would pass at school. When her mother found the vibrator in the victim's room along with the note, she called the victim at the victim's father's house. She told her mother the note meant nothing and not to worry about it.

However, her mother kept asking her what she meant by it, and eventually she told her mother defendant was doing things to her. She could tell her mother was mad at her. Defendant told her just to tell the truth and everything would be fine, which she interpreted to mean do not tell the truth, just say nothing happened.

¶ 29 Eventually, she told her stepmother what exactly was happening, and her father and stepmother took her to Alton Memorial Hospital, where she was told to go to Children's Hospital. She talked to a social worker and told her a few things but did not divulge everything. A rape kit was performed. The victim said she was scared and did not know what was going on because that was the first time she ever had a vaginal examination. She "just wanted everything to go back to normal." She wished her mother never found the note. She said she knew her mother was disgusted by her. When she went home, she just told everyone she lied and nothing happened.

¶ 30 The victim testified she lied during the first CAC interview when she told the interviewer that nothing happened. At the end of the interview, she could tell the interviewer did not believe her. She just wanted the interviewer to believe her, so she could go home and have everything go back to normal.

¶ 31 The victim testified she eventually told her stepmother the truth because she got mad and did not want to protect defendant anymore. Her mother was still with defendant and put him on the phone during one of their conversations. This infuriated the victim and made her want to throw the phone. She finally told her stepmother the truth, and a second CAC interview was scheduled.

¶ 32 During the second CAC interview, the victim told the interviewer she lied during the first interview and apologized for doing so. She then went on to give the interviewer details about

9

what transpired between her and defendant. She said she felt relieved after the second interview. When asked how she felt now, the victim responded:

"I feel gross. I was 11 years old and—I was ten and 11. I was taken advantage of, and I had feelings for someone I should never have had feelings for. That is really hard for me to say out loud. I just feel gross and nasty that I ever enjoyed it."

The victim further testified that since the second CAC interview, she has never told anyone she was lying about defendant and that he really did not have sex with her. She said defendant was 25 and 26 when this occurred.

¶ 33 Stephanie Whitaker, a pediatric medical social worker for Children's Hospital, interviewed the victim at the hospital when the victim came for an examination. She prepared a report at the time of the interview and reviewed that report to refresh her memory. Whitaker could not remember the victim's mannerisms, but testified that the victim told her she was there because she had been raped by her stepfather. When asked to explain, the victim said defendant pulled her pants down and stuck his thing in her. The victim did not want to talk about body parts, but preferred pointing to areas of her body.

¶ 34 The victim told Whitaker it happened over the course of a year and took place at least 10 times. The victim said the last time something sexual occurred between her and defendant was two or three weeks prior. The victim told her the incidents occurred in her bedroom or her parents' bedroom. The victim also told her that defendant made her put her hand on his thing and go up and down and described defendant putting his fingers inside her. Whitaker said the victim did not disclose any anal penetration or oral sex, nor did she disclose any sexual acts that occurred in a car or a hotel.

10

¶ 35 Jessica Buhs, who performed the first and second CAC interviews, testified about those interviews. She noted the first interview was challenging because she could not get a consistent statement from the victim. The victim said she made up this lie because defendant walked in on her while fingering herself. Buhs said the victim was not comfortable talking about body parts or sex.

¶ 36 Buhs testified she did not talk to the victim or the victim's family between the first and second interviews. According to Buhs, conducting a second interview is not unusual, but it does not happen all the time. During the second interview, the victim was again hesitant about discussing body parts. In addition to making the disclosures about the sexual acts that occurred, the victim also drew a layout of her bedroom and areas where she thought sperm might be present. Both recorded interviews were played for the jury.

¶ 37                    2. MEDICAL AND FORENSIC EVIDENCE

¶ 38 Dr. Julie Leonard, an expert in pediatric medicine and the physician who examined the victim on March 25, 2008, at Children's Hospital, testified that after 72 hours, there is nearly a zero percent chance any DNA evidence will be recovered inside the body. She noted that the victim was through puberty and was sexually developed in terms of physical appearance. She said the victim's hymen was thicker and secreted more fluid and was intact. She found nothing abnormal.

¶ 39 On cross-examination, Dr. Leonard noted that the victim denied anal contact or penetration and oral sex. She also admitted the victim did not have any vaginal tearing or lesions nor was there any bruising or scarring. She acknowledged that tears in the hymen would be consistent with a sexually active person.

¶ 40    A piece of carpet taken from the area where the victim indicated defendant would ejaculate was tested. After performing a DNA analysis on the carpet and comparing it to a DNA swab with defendant's DNA, it was determined that defendant was the source of the semen profile found on the carpet. On cross-examination, it was noted that the sperm and semen sample could have existed in the carpet for months and years and that there was no way to determine the age of the stain.

¶ 41                              B. DEFENDANT'S CASE

¶ 42    The victim's mother testified she lived with defendant for three years. She said the victim was 11 years old and in seventh grade when the allegations of sexual abuse came to light. She testified her daughter was a straight A student at the time, and she had no abnormal behavioral problems for an 11-year-old. She said she never discussed any adult situations with the victim before the allegations arose. She testified defendant smoked cigarettes. She did not know if he smoked cigars or not.

¶ 43    She could not recall whether she was having difficulties with her relationship with defendant right before the allegations surfaced, nor could she recall a conversation between her and the victim in which the victim pleaded with her not to end the relationship. She recalled the phone conversation in the car after the allegations surfaced. She testified she was talking to her children on speaker phone in the car while driving with defendant. She said the conversation between the children and defendant lasted approximately 45 seconds. On cross-examination, she admitted that when the victim was in middle school, the victim did not get in trouble nor did the victim lie to her.

¶ 44    Defendant took the stand. He said he was currently employed by Allied Industrial Equipment as a road technician. Defendant testified he purchased his home in 2002. He said he

used the downstairs bedroom as the master bedroom when he first moved into the home and was renovating the upstairs of the home. He said he was fairly promiscuous when he purchased the home and had sex in the downstairs bedroom. He and the victim's mother eventually used it as their bedroom until they later moved upstairs. Thus, he also had sex in the downstairs bedroom with the victim's mother.

¶ 45 Defendant testified he and the victim's mother were having some difficulties in their relationship, and when he told the victim, she became upset and told him she did not want him to split up with her mom. A few weeks later the allegations surfaced. Defendant testified he smokes cigarettes, but not cigars. He recalled walking in on the victim masturbating sometime in 2007 or 2008. Defendant denied all sexual allegations made by the victim.

¶ 46 Dr. Joseph Mitton, a board certified emergency medical doctor, testified as an expert. He reviewed the medical records of the victim and defendant. He noted no abnormalities in either defendant or the victim. He testified the first sexual experience for a girl 10 or 11 would be painful, and "there can be bleeding, but it doesn't have to occur." He noted that a hymen can remain intact even if a woman is having sexual relations. He said if sexual activity occurred two or three weeks prior to an examination there would "[n]ot necessarily" be evidence of such, as injuries can heal within two weeks, and there would be no remains of semen at that point.

¶ 47 C. CONVICTION AND SENTENCING

¶ 48 After hearing all the evidence, the jury deliberated for several hours before convicting defendant on all four counts. At approximately 6:50 p.m., the jury asked three questions. The trial court sent back answers to all three questions with the approval of the parties. The jury sent a second note later in the evening, stating, "The jury is deadlocked at 6-6. We need guidance to the definition of reasonable doubt. We also would like to adjourn for the evening[.]" The trial

13

court sent a response with the consent of both parties, in which it explained there is no definition of reasonable doubt and directed the jury to rely upon the instructions provided. The trial court asked the jury members whether they might be able to reach a verdict if they deliberated for another hour and asked the jury for a specific reason as to why the jury wanted to adjourn for the evening. The jury responded with another note, in which it asked for a copy of the victim's note and agreed to deliberate for another hour. The jury was able to reach a guilty verdict that evening.

¶ 49 A sentencing hearing was conducted during which the victim's impact statement was read into the record. Nine witnesses testified in mitigation. Letters and other materials were also submitted for the court's consideration. The State argued for a sentence of 15 years per count, while defendant asked for a sentence of 6 years per count. The trial court sentenced defendant to 8 years per count for a total of 32 years. Defendant filed a motion to reduce and/or modify sentence, which the trial court denied. Defendant filed a timely notice of appeal.

¶ 50                                             ISSUES

¶ 51                                    I. CAC INTERVIEWS

¶ 52 The first issue raised on appeal is whether the trial court erred in admitting the victim's out-of-court videotaped statements through Jessica Buhs pursuant to section 115-10 of the Code. Defendant admits he failed to properly preserve this issue for appeal because defense counsel did not include it in a motion for new trial, but insists the admission of such statements constitutes plain error. Defendant argues the evidence presented at the section 115-10 hearing showed that the time, content, and circumstances of the statements failed to provide sufficient safeguards for its reliability. We disagree.

14

¶ 53    Section 115-10 of the Code permits the State to introduce the following testimony in a prosecution for a physical or sexual act perpetrated upon or against a child under 13 years of age as an exception to the hearsay rule:

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and
>
> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(1), (2) (West 2008).

This testimony may only be admitted into evidence if "(1) [t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2008). In order to be admissible the statement must have been made either before the victim turned 13 years of age or within 3 months of the offense. 725 ILCS 5/115-10(b)(3) (West 2008).

¶ 54    While defendant concedes an issue is generally waived where, as here, the issue was not raised in a posttrial motion, he asks us to consider this an issue of plain error. Illinois Supreme Court Rule 615(a) specifically provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). The plain error analysis provides a limited and narrow exception. *People v. Harvey*, 211 Ill. 2d 368, 385, 813 N.E.2d 181, 192 (2004). Reviewing courts typically undertake plain error analysis by first determining whether any error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010).

15

¶ 55    There are no precise tests for evaluating trustworthiness or reliability, but rather particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements. *People v. West*, 158 Ill. 2d 155, 164, 632 N.E.2d 1004, 1009 (1994); *People v. McMillan*, 231 Ill. App. 3d 1022, 1025, 597 N.E.2d 923, 925 (1992). Important factors in determining reliability include the child's spontaneous and consistent repetition of the incident, the child's mental state, the use of terminology expected of a child of a similar age, and lack of motive to fabricate. *People v. Bowen*, 183 Ill. 2d 103, 120, 699 N.E.2d 577, 586 (1998); *West*, 158 Ill. 2d at 164, 632 N.E.2d at 1009. A trial court has considerable discretion in admitting hearsay statements; therefore, a reviewing court will not disturb a trial court's decision absent an abuse of discretion. *People v. Zwart*, 151 Ill. 2d 37, 44, 600 N.E.2d 1169, 1172 (1992).

¶ 56    In the instant case, the trial court wrote a thorough and complete order in which it specifically found that "[b]ased upon the testimony presented at the hearing and the video/audio of the statements and the factors bearing upon the sufficient safeguards of reliability," the CAC interviews were reliable and admissible and could be presented through the testimony of Jessica Buhs. Defendant, however, maintains that the victim's statements were not spontaneous, consistent, or reliable because (1) the victim permitted the alleged abuse to occur for a year before her mother found a note that prompted her disclosure, and the second CAC interview only occurred after her father became angry; (2) there was inconsistency in the statements, which shows the victim's mental state was not conducive to telling the truth; and (3) there was motive to fabricate.

¶ 57    The record before us shows the trial court did not abuse its discretion in finding the victim's statements reliable. The two interviews were conducted approximately one month apart, with the first occurring after the victim's mother discovered the note. The victim was 11 years

16

old at the time of both interviews. Buhs was a trained forensic interviewer who had no contact with the victim or her family but for these two interviews. Buhs started by informing the victim of the importance of telling the truth. Our review of the interviews shows the victim is clearly uncomfortable during both interviews. She can barely stand to hear or say any words pertaining to sex or genitalia, which is normal for an 11-year-old. At the end of the first interview in which she denied any sexual abuse by defendant, she specifically asks Buhs, "Does it sound like I'm telling the truth?" The victim's question is significant. It indicates the victim was indeed holding back and not telling the truth. Buhs correctly pointed out to the victim that her story was not adding up.

¶ 58    During the second interview, the victim apologized to Buhs for lying during the first interview and then went on to detail sexual acts between her and defendant. The victim said she decided to tell the truth after her mother continued to see defendant and allowed defendant to talk to the victim during a phone call. The second interview shows the victim again embarrassed and struggling with sexual terminology. She was emotional and cried during the interview, but was nevertheless forthcoming.

¶ 59    Despite defendant's assertions, the victim does not appear to be coached, as she freely admits to coming to enjoy the sexual encounters. Our review of the interviews shows Buhs did not coerce or manipulate any statements, but allowed the victim to talk freely while gently reminding the victim none of this was her fault, and that the body is made to enjoy sex. Defendant insists the changing stories between the first and second interviews show the victim's mental state was not conducive to telling the truth. We are unconvinced.

¶ 60    Finally, we disagree with defendant that the victim possessed motives to fabricate. According to defendant, the victim's motives include her being caught masturbating by

17

defendant, her crush on defendant, and her jealousy toward her mother's relationship with defendant. What defendant fails to consider, however, is that the victim's motives were contrived during her first CAC interview. Initially, the victim told Buhs she made up the story about being abused because defendant caught her "fingering" herself. When it became clear to the victim that Buhs was unconvinced by her assurance that nothing torrid had occurred between her and defendant and she had made the whole story up because she was embarrassed by being caught masturbating, the victim changed her story and said she had a crush on defendant. Thus, the victim's alleged motives were red herrings set forth by the victim to attempt to cover up defendant's actual abuse. The victim's motives to fabricate that the abuse did not occur include her embarrassment over the sexual acts she participated in with defendant and her desire not to hurt her mother.

¶ 61    Defendant further contends, without citation to the record, that the victim's stepmother, Ms. Gutierrez, was herself a victim of sexual abuse "sometime in her life" and because she discussed the allegations of abuse by defendant with the victim more than 20 times, Gutierrez coached the victim. However, we have discovered nothing in the record to support defendant's theory that Gutierrez was a victim of sexual abuse. For example, it was not brought up during cross or direct examination during either the section 115-10 hearing or the trial. Even assuming *arguendo* that Gutierrez was a victim of sexual abuse, our review of the record does not show that the victim was coached into lying about the sexual abuse by defendant. While Gutierrez did admit she talked with the victim at least 20 times about the allegations of abuse, another conclusion that can be drawn from this admission is that Gutierrez was acting as a good stepmother should.

18

¶ 62    The record unequivocally shows that the victim's mother was initially unconvinced by the victim's allegations against defendant, so it was up to the victim's father and stepmother to help her sort out this sordid mess. Under these circumstances, we cannot say the trial court abused its discretion in finding the CAC interviews sufficiently reliable to satisfy their admission pursuant to section 115-10 of the Code. Accordingly, the trial court's admission of such evidence does not constitute plain error.

¶ 63                    II. REPORT PREPARED BY STEPHANIE WHITAKER

¶ 64    The second issue raised on appeal is whether the trial court erred in admitting the victim's out-of-court statement through the testimony of Stephanie Whitaker. Defendant contends the trial court committed plain error when it allowed Stephanie Whitaker to testify because there was never a section 115-10 hearing and the court was merely asked to consider Whitaker's written report and then make a determination as to whether the victim's statements to Whitaker met the criteria of time, content, and circumstances set forth in section 115-10. However, as the State points out, defendant acquiesced in the very procedure he is now attempting to raise as plain error.

¶ 65    The record shows that on the day the jury trial was set to begin, the parties appeared prior to the start of *voir dire* to address numerous issues, including the State's request to allow Stephanie Whitaker to testify regarding statements the victim made to her at Children's Hospital. Defense counsel specifically stated he agreed to allow the trial court to look at the report and then make a determination as to admissibility. Thus, we agree with the State that defendant is estopped from raising the issue as one of plain error when he acquiesced in the challenged procedure. See *Harvey*, 211 Ill. 2d at 385, 813 N.E.2d at 192.

¶ 66 Defense counsel did object on the basis that the statement failed to meet the admissibility criteria under section 115-10; however, the trial court stated on the record that it found "the time, content, and circumstances provide sufficient safeguards for reliability pursuant to 725 ILCS 115-10" and allowed the statement to be admitted. Defendant did not raise this issue in a posttrial motion, nor does he raise an issue of ineffective assistance of counsel. We point out once again that plain error is inapplicable if no error in fact occurred. See *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059.

¶ 67 Under the circumstances presented here, we cannot say the trial court's decision to allow the victim's out-of-court statements to Stephanie Whitaker to be admitted pursuant to section 115-10 of the Code was an abuse of the trial court's considerable discretion. The report has not been made part of the record, making it virtually impossible for defendant to show how the trial court abused its discretion. Furthermore, because the victim's statements to Whitaker were made at Children's Hospital, where she was taken after she first reported the abuse, it appears the time and circumstances of the statement provide sufficient safeguards of reliability. The victim was under 13 years of age, and she testified at trial. The parties agreed that if Whitaker was called to testify, she would testify consistently with her report. For these reasons, we are unconvinced by defendant's argument that the trial court's ruling in favor of admissibility of Whitaker's report under section 115-10 was in error.

¶ 68 III. CROSS-EXAMINATION REGARDING DIARY ENTRIES

¶ 69 The third issue raised on appeal is whether the trial court erred in prohibiting defense counsel from cross-examining the victim regarding certain entries in notebooks. Defendant argues his attorney attempted to cross-examine the victim regarding certain diary entries for the purpose of exposing potential biases, prejudices, and/or motives to testify, but the trial court

20

prevented him from doing so, thereby causing him manifest prejudice and violating his constitutional rights to confrontation. Defendant insists the trial court's refusal to allow the victim to be cross-examined about her diary entries amounts to an abuse of discretion and warrants a new trial. The State replies that the trial court's refusal to allow the victim to be cross-examined regarding the diary entries was not an abuse of discretion, and even assuming *arguendo* it was error, it does not amount to reversible error. We agree with the State.

¶ 70 The confrontation clause of the sixth amendment of the United States Constitution, which applies to the states via the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This right includes the right to cross-examine a witness as to his or her biases, interests, or motives to testify. *People v. Triplett*, 108 Ill. 2d 463, 474, 485 N.E.2d 9, 15 (1985). A trial court has discretion to impose reasonable limits on cross-examination to limit potential harassment, prejudice, jury confusion, or repetitive and irrelevant questioning. *People v. Buckner*, 376 Ill. App. 3d 251, 255, 876 N.E.2d 87, 91 (2007). A trial court abuses its discretion only where its decision is arbitrary, unreasonable, or fanciful, or where no reasonable person would take the view adopted by the trial court. *People v. Pelo*, 404 Ill. App. 3d 839, 864, 942 N.E.2d 463, 485 (2010).

¶ 71 Prior to trial, the State filed a motion *in limine* to bar defendant from using notebooks in which the victim made diary entries. The State asserted defense counsel only disclosed he was in possession of such notebooks five days earlier, despite the fact the defense had been in possession of such notebooks for years. Defense counsel admitted he possessed the notebooks for years, but asserted he mistakenly believed he disclosed their contents to the State much earlier. The trial court asked defense counsel to specifically address the relevancy of the entries,

21

and defense counsel demurred, asking the court to revisit the issue before the victim testified or before cross-examination. The trial court agreed.

¶ 72 The victim testified, and defense counsel cross-examined her without raising or mentioning the notebook entries. After the victim testified, defense counsel realized he "omitted" the diary entries during cross and made an offer of proof about the contents of the entries with which he wanted to confront the victim, specifically stating:

> "There are just a few pages out of these notebooks that I wanted to ask the witness about. One of them was a little drawing with some stuff on there, I love/heart you Garrett Rottau and then [the victim]. Then there is apparently a dear diary note—and I'll read it for the record—dated 3/16/08 which is right before right here, I swear Garrett and mom are really serious. They flirt and I think they get b-u-s-y or I mean sex. There is noise upstairs that won't stop and the only way or conclusion that dogs are wagging their tails or mom and Garrett are having sex, Ewww, E-w-w-w, exclamation mark, 3/16/08 at 10:52 PM. There is another little entry outlining just different parts. It looks like—almost looks like it's from anatomy class with a vagina, penis, children, sex. And on the back cover [']I heart Garrett Rottau.['] Now, I realize the witness admitted that she probably had some sort of crush, so I don't know if it's cumulative or whatever. I think the subject matter's been dealt with, but I think as to the knowledge of—I think as to the—if that was her writing, and she could have denied it or admitted it, as to Garrett's acknowledgment of her mother and my client having sex. I think it would be relevant."

Ultimately, the trial court noted that from the victim's testimony it was clear she understood the relationship between defendant and her mother and denied defense counsel's request to cross-examine on relevancy grounds.

¶ 73    In his posttrial motion, defense counsel provided additional material beyond what he submitted during the offer of proof, including an entry dated approximately four months earlier than what was tendered during the offer of proof. Defense counsel read the entry which stated as follows: "My step-dad Garrett is a f***in' jerk because he called me fat and I'm eleven well Garrett you can kiss my harry [*sic*] f***in' ass ok. I'm not fat I'm normal sized okay. I even checked. Well I hate Garrett now. Bye you jerk!! Loser Loser." Neither the notebooks nor the pages specifically complained of by defendant are part of the record on appeal.

¶ 74    The trial court's denial of defendant's request to allow the victim to be cross-examined on her diary entries was grounded on relevancy. "Evidence is 'relevant' if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Roberson*, 401 Ill. App. 3d 758, 771-72, 927 N.E.2d 1277, 1289 (2010). The issue of whether evidence is relevant and admissible is left to the sound discretion of the trial court. *Pelo*, 404 Ill. App. 3d at 864, 942 N.E.2d at 485.

¶ 75    The record is replete with evidence of the victim's feelings for defendant. For example, in the first CAC interview the victim admitted she had a crush on the victim, and she testified as to her inappropriate feelings about defendant during her live testimony. Therefore, the diary entries would merely have been cumulative. A review of the victim's testimony shows she had a love/hate relationship with defendant. We agree with the State that admission of the diary entries might have only served to corroborate the victim's testimony rather than contradict it. Overall, we cannot say the trial court abused its discretion in not allowing defense counsel to cross-examine the witness about the diary entries raised in the offer of proof.

¶ 76    As to the entry about defendant calling the victim fat, we agree that it was not repetitive; however, it was not mentioned during defendant's offer of proof. Failure to make an adequate

23

offer of proof results in forfeiture. *People v. Wilder*, 146 Ill. App. 3d 586, 589, 496 N.E.2d 1182, 1184 (1986). Thus, the only way we can review this error is pursuant to the plain error doctrine.

¶ 77    The plain error doctrine allows a court to review a forfeited error if: (1) the evidence is so closely balanced that the error threatens to tip the scales of justice against the defendant, or (2) the error is so serious that it affects the fairness of the defendant's trial. *People v. Chaban*, 2013 IL App (1st) 112588, ¶ 57, 994 N.E.2d 1057. Defendant insists the evidence here was closely balanced because it basically boils down to an issue of credibility between the victim and defendant.

¶ 78    We are aware that lengthy jury deliberations and a note informing that the jury could not reach a conclusion are factors to consider in deciding whether evidence was closely balanced. *People v. Gray*, 406 Ill. App. 3d 466, 474, 941 N.E.2d 338, 345 (2010). However, "the length of time a jury deliberates is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342, 812 N.E.2d 339, 353 (2004). A jury's difficulty in reaching a verdict is only a single factor to be considered in deciding whether the evidence was closely balanced. *People v. Vasquez*, 368 Ill. App. 3d 241, 251, 856 N.E.2d 523, 533 (2006). *Vasquez* held the evidence was not closely balanced even though there was a jury note indicating deadlock where two police officers testified they saw the defendant with a firearm despite a defense witness contradicting the officer's testimony. *Id.*

¶ 79    In the instant case, the jury sent a note that it was deadlocked 6-6. The trial court specifically asked the jury members whether they thought they could reach a verdict if they deliberated for another hour. The jury agreed to do so and was able to reach a verdict that same evening. Thus, the fact that the jury was initially deadlocked and sent some notes is not enough

24

to convince us that the evidence was so closely balanced that the scales of justice have been tipped against defendant.

¶ 80    After careful consideration of the record before us, we find the victim was a strong witness, despite the fact that she initially wavered in her complaints against defendant. We have previously determined that the victim's second statement was reliable during our analysis of the first issue, and we see no need to repeat that analysis here. Suffice it to say, since her second CAC interview, the victim's accusations have remained consistent. At the time of trial, some seven years after the allegations first came to light, the victim, a college student, remained steadfast in her accusations against defendant.

¶ 81    Moreover, defendant's DNA was found on the carpet where the victim said he ejaculated. Defendant's response was that he was promiscuous in his early 20s before he started dating the victim's mother, and the DNA likely came from a sexual encounter with another woman or with the victim's mother. His other main defense was that he did not smoke cigars, only cigarettes. Thus, defendant attempted to imply the victim was lying when she testified about having sex in a car while she and defendant were on their way to St. Louis to purchase cigars because he did not smoke cigars. The jury was as likely underwhelmed by defendant's testimony as we are.

¶ 82    Finally, even assuming *arguendo* that it was error not to allow defense counsel to cross-examine the victim about these diary entries, the error was harmless. Our Illinois Supreme Court has noted a trial cannot be conducted without error, and perfection in trial procedure is virtually unattainable. Accordingly, a defendant in a criminal case is entitled to a fair trial, not necessarily a perfect trial. *People v. Bull*, 185 Ill. 2d 179, 214-15, 705 N.E.2d 824, 841 (1998). After careful consideration, we find that if any error occurred because defense counsel was not allowed to

25

cross-examine the victim regarding her diary entries, the error was not so grave that it infected the fundamental fairness of the trial.

¶ 83                                    IV. SENTENCING

¶ 84    The final issue raised on appeal is whether the trial court erred in sentencing defendant to 32 years in prison. Defendant contends the trial court erred because it relied on the victim's age as an aggravating factor in imposing punishment when the victim's age was already an element of the crimes for which he was convicted. We are unconvinced.

¶ 85    "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943, 904 N.E.2d 1022, 1028 (2009). While it is true that a trial court cannot utilize a factor inherent in the offense as an aggravating factor at sentencing, remand is not inherently warranted even if the trial court considered an improper sentencing standard. In *People v. Bourke*, 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340 (1983), our supreme court specifically stated:

> "[R]eliance on an improper factor in aggravation does not always necessitate remandment for resentencing. Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing. [Citations.] However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. [Citations.]"

*Bourke* is similar to the instant case.

¶ 86    In *Bourke*, the trial judge noted three statutory aggravating factors: (1) the defendant received compensation for committing the offense, (2) the defendant had a history of prior

26

delinquency and criminal activity, and (3) the sentence to be imposed was necessary to deter others. On review, our supreme court set forth that while it was improper for the court to have considered compensation, "the record adequately demonstrate[d] that the weight placed on the improperly considered aggravating factor was so insignificant that it did not result in a greater sentence." *Id*. at 333, 449 N.E.2d at 1341. The court noted the State did not mention compensation in its closing argument, but rather stressed the defendant's " 'flagrant violation of the terms of probation,' " which was the same factor emphasized by the trial court in sentencing the defendant. *Id*.

¶ 87    In the instant case, the State set forth three aggravating factors: (1) defendant's conduct caused or threatened serious harm, (2) a severe sentence was necessary to deter others, and (3) defendant held a position of trust with the victim. The State did not mention the victim's age as an aggravating factor. The State asked for a sentence of 15 years on each count, while defendant asked for the minimum of 6 years per count. In imposing its sentence, the trial court noted the range of sentence allowable was between 6 and 30 years per count. The trial judge noted three factors in aggravation, including (1) serious injury to the victim, (2) defendant's position of trust, and (3) deterrence. As for mitigation, the trial court specifically noted defendant did not "have any significant criminal history, but that alone is not enough, at least in my mind, that would warrant the minimum sentence in this case." However, defendant's lack of criminality was enough to make the trial court reject the State's request for a 15-year sentence per count. Ultimately, the trial court imposed a sentence of eight years per count.

¶ 88    It is important to note that when the sentence was actually pronounced, the trial court made no reference to the improper aggravating factor of age. It was not until the hearing on defendant's motion to reconsider sentence that the trial court noted the victim's age as a factor in

27

aggravation. The trial court's reference to the victim's age was made only in passing. In addition, the trial court again noted the proper factors in aggravation it previously relied at the sentencing hearing. Thus, as in *Bourke*, the weight the trial court placed on the improper sentencing factor was insignificant.

¶ 89 Considering the record as a whole, we find the trial court based its sentence on proper aggravating and mitigating factors. The trial court sentenced defendant to 8 years, well below the maximum sentence of 30 years and well below the 15 years requested by the State. Because the weight placed upon the improper sentencing factor was so insignificant that it did not lead to a greater sentence, we need not remand for resentencing. Accordingly, we affirm defendant's sentence.

¶ 90                                  CONCLUSION

¶ 91 For the foregoing reasons, we affirm the judgment of the circuit court of Madison County. The State asks us to tax costs against defendant. A review of the circuit court's order shows that this issue was not addressed. Whether costs should be assessed is a question better answered by the circuit court. Accordingly, we remand for a determination as to whether costs should be assessed against defendant.


¶ 92 Affirmed and remanded in part.

2017 IL App (5th) 150046

NO. 5-15-0046

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 08-CF-1756 |
| | ) | |
| GARRETT ROTTAU, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed:**   March 30, 2017

**Justices:**   Honorable Richard P. Goldenhersh, J.

Honorable Judy L. Cates, J., and
Honorable David K. Overstreet, J.,
Concur

**Attorneys for Appellant**   N. Scott Rosenblum, Hannah Zhao, Jessica M. Hathaway, Rosenblum, Schwartz, Rogers & Glass, P.C., 120 South Central Avenue, Suite 130, St. Louis, MO 63105

**Attorneys for Appellee**   Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse, 157 N. Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino, Director, David J. Robinson, Acting Deputy Director, Patrick D. Daly, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864